FILED

August 07, 2007

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0000856069

**11 Pages**

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
DANIEL L. EGAN (SBN 142631)
MEGAN A. LEWIS (SBN 221263)
400 Capitol Mall, Twenty-Second Floor
Sacramento, CA  95814

Telephone:    (916) 441-2430
Facsimile:    (916) 442-6664

Attorneys for Trustee
MICHAEL F. BURKART

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: | Case No.  06-25251 |
| WIRE COMM WIRELESS, INC., | WFH-3 |
| Debtor, | |
| | **Date:** September 4, 2007 |
| | **Time:** 9:30 a.m. |
| | **Dept:** C |

## MOTION FOR ORDER APPROVING COMPROMISE WITH RICHARD, SHIRLEY, TIMOTHY AND RENEE MCCORMICK

Michael F. Burkart, the duly appointed trustee in the above-referenced case, hereby moves for an order pursuant to Federal Rule of Bankruptcy Procedure 9019 approving a compromise between Trustee and Richard, Shirley, Timothy and Renee McCormick.

### I.
### FACTUAL BACKGROUND

Debtor Wire Comm Wireless, Inc. was, until July 2005, a retailer of cellular telephones and wireless phone services. Declaration of Tim McCormick, ¶1.  Debtor's shareholders are Richard and Shirley McCormick, and Timothy and Renee McCormick.  Timothy McCormick was the president of Debtor.

Debtor was originally a dealer for AT& T Wireless and, when AT&T Wireless was

297551.2

- 1 -

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

acquired by Cingular, became a dealer of Cingular products. As an AT&T/Cingular dealer, Debtor purchased wireless equipment from AT&T/Cingular, and then resold this equipment to retail customers. Debtor also sold AT&T/Cingular wireless phone plans to retail customers. Debtor received payment directly from its retail customers for equipment purchases, and received commissions from AT&T/Cingular for the phone plans sold to the retail customers. The Debtor's commissions from the sale of phone plans was based on a rather complicated calculation taking into account the type of plan purchased by the customer and the length of time that the customer continued to participate in the plan. Debtor's business was conducted primarily from kiosks in malls located in the Central Valley of California and Las Vegas, Nevada.

On June 8, 2004 Tim and Renee McCormick purchased a condominium in Las Vegas, Nevada for a price of $760,000. McCormick Decl., ¶6. Although title to the Las Vegas Condominium was held in the name of Renee McCormick, the down payment (in the amount of $201,000) was paid by Debtor, the mortgage payments were paid by Debtor, and the condominium was listed on the Debtor's tax returns as owned by Debtor. The Closing Statement for the purchase of the Las Vegas condominium is attached as Exhibit B.

Beginning in mid 2004 Debtor and Cingular became embroiled in a series of disputes regarding the amount of commissions that had been earned by the Debtor. Debtor alleges, and Cingular seems to admit, that the transition of the business from AT&T to Cingular caused certain accounting problems for Cingular. Although the parties engaged in an accounting reconciliation process, ultimately the Debtor was dissatisfied with the result. Following a meeting or series of meetings between Debtor's principals and Cingular in June 2005, Debtor purported to terminate its dealer agreement with Cingular. Debtor's last day selling Cingular products appears to have been July 19, 2005.

Immediately following the termination of Debtor's business for Cingular on July 19, 2005, Debtor's principals created a new corporation named Premiere Wireless Solutions, Inc. ("Premiere".) McCormick Decl., ¶3. Premiere became a dealer of Verizon wireless products and services. On or about July 19, 2005 Debtor transferred its assets, including at least $144,617 in cash and leases for its retail stores, to Premiere. Id. Premiere paid no consideration for this

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

transfer, except that it apparently assumed the liabilities under certain leases. In addition, Premiere is listed (in Debtor's Schedules) as owing $144,617 to the Debtor - presumably a debt arising out of the acquisition of Debtor's business. Premiere went out of business in early 2006 and has no assets. McCormick Decl., ¶3.

In 2004 Richard and Shirley McCormick sold a residence in Fresno, California for the sum of $580,000, realizing net proceeds of $261,000. A copy of the Closing Statement is attached as Exhibit C. Although title to the residence was held in the name of Richard and Shirley McCormick, the residence appears to have been listed on Debtor's tax return as an asset of the Debtor. The McCormicks appear to have retained the proceeds of the sale.

On September 8, 2005 Debtor commenced an arbitration proceeding against Cingular alleging that Cingular owed Debtor unpaid commissions, lost profits and damages totalling $1,225,853. A copy of the Demand for Arbitration is attached as Exhibit D. Cingular responded on October 18, 2005 with a counterclaim asserting that the Debtor owed Cingular monies, in an amount that was under investigation and would be determined prior to the arbitration. A copy of the Answer and Counterclaim is attached as Exhibit E. Discovery in the arbitration proceeded, but the actual arbitration continued to be rescheduled and delayed. Debtor retained different counsel in August 2006. The arbitrator subsequently issued certain pre-hearing decisions, including a decision eliminating Debtor's defenses to the counterclaim based upon the contractual limitations provisions and the contractual limits on recoverable damages. Eventually, an arbitration hearing was scheduled to be held in mid December.

On August 28, 2007 Cingular filed an action in the Superior Court for the County of Sacramento against Richard, Shirley, Timothy and Renee McCormick, Debtor and Premiere alleging that the McCormicks and Premiere had received avoidable fraudulent transfers and that the Court should disregard the corporate separateness of Wire Comm and Premiere from the McCormicks. A copy of Cingular's state court complaint is attached as Exhibit F.

The Debtor commenced this voluntary Chapter 7 case on December 8, 2007, and Trustee was appointed as Trustee in the case. Schedule B of the Schedules of Assets and Liabilities listed the following assets of the estate:

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

1.     A claim against Cingular in the sum of approximately $1,970,000;

2.     A deposit with the American Arbitration Association in the approximate amount of $16,000.

3.     A claim against Brian Mekush in the amount of $60,000 based on a loan by the Debtor to Mr. Mekush.

4.     A claim against the law firm of Lang, Richert & Patch for alleged malpractice. Lang, Richert & Patch represented Debtor and the McCormicks in the arbitration with Cingular until August 2006.

Cingular filed a claim in the case in the amount of $2,949,703.17 based upon the claims made in the arbitration proceeding. Tim McCormick filed a claim in the amount of $429,099, and Richard McCormick filed a claim in the amount of $199,400, based upon payments they had made as a guarantor or co-obligor of debts of Debtor. The Internal Revenue Service has filed a claim for priority taxes in the amount of $108,570.55, and other unsecured claims are asserted against the estate in the approximate aggregate amount of $196,000. The Debtor appears to dispute the priority claim asserted by the IRS.

On April 28, 2007 Renee McCormick sold the Las Vegas Condominium and retained net proceeds of $257,343. McCormick Decl., ¶5. A copy of the Closing Statement for the sale of the Las Vegas Condominium is attached as Exhibit J. On July 12, 2007 Trustee commenced an action against Cingular seeking at least $1,900,000 in damages for breach of contract and objecting to Cingular's claim in full. Trustee and the McCormicks have now agreed to settle their respective claims as follows.

## II.
## THE PROPOSED COMPROMISE

Trustee, the McCormicks and Premiere have agreed to compromise the disputes among them in a settlement agreement that contains the following basic terms:

1.     The McCormicks will pay the estate the sum of $257,343, representing the net proceeds of the sale of the Las Vegas condominium. The payment will be made in two installments. The first installment, of $50,000, is due within seven days of signing the settlement

WEEL, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

agreement.   The balance, of $207,343, will be due within 10 days of bankruptcy court approval of the settlement.

2.     The proofs of claim of Tim McCormick and Richard McCormick will be allowed in the amounts asserted in the claims.

3.     The McCormicks will assign all of their rights against Lang, Richert & Patch to the estate to avoid confusion regarding which possible claims might be owned by the Debtor, as opposed to the principals.

4.     The estate and the McCormicks will exchange mutual general releases, including 1542 waivers, excepting only the amounts set forth in the proofs of claim and the amounts due under the settlement agreement.

5.     The McCormicks will confirm the physical address of Brian MeKush.

6.     The settlement will be subject to:

(a) Bankruptcy Court approval after an opportunity for overbidding;

(b) Dismissal of the state court action brought by Cingular against the McCormicks; and

(c) Confirmation that Brian MeKush has been properly served in Burkart v. Mekush.

A copy of the settlement agreement is attached as Exhibit A.

### III.
### DISCUSSION

Federal Rule of Bankruptcy Procedure 9019 authorizes the Court to approve a compromise upon notice to creditors.  The court in *In re America West Airlines*, 214 B.R. 382 (Bankr. D. Az.1997) set forth the standard for approving a compromise as follows:

> In the decision to approve a proposed settlement agreement under Rule 9019, the court considers the factors set forth in the *Woodson* case cited above.  The *Woodson* factors are:
>
> (a)     The probability of successful litigation;
>
> (b)     Impediments, if any, to collection;
>
> (c)     The complexity, expense, inconvenience, and delay of litigation; and

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
A LAW CORPORATION
SACRAMENTO

(d) The interests of the creditors with deference to their reasonable opinions. *In re America West Airlines*, 214 B.R. 382, 386, citing *In re Woodson*, 839 F. 2d 610, 620 (9th Cir. 1988).

Trustee has identified four potential theories of recovery against the McCormicks, but believes that the settlement is a fair and equitable resolution of such disputed claims.

## A. The Claim Based On the Sale of the Fresno Residence

Trustee believes that the Fresno residence was listed as an asset of Debtor on Debtor's tax returns and, while legal title was held in the name of Richard and Shirley McCormick, equitable title may have been held in the Debtor. If so, the proceeds of the sale would be property of the Debtor, and transfer of the proceeds to the McCormicks might be challenged as a fraudulent transfer. If successful, the Trustee would recover the sum of $261,000. In addition, until such amounts were repaid, Trustee would seek disallowance of Richard McCormick's $190,000 claim under Section 502(d).

In defense, the McCormicks will argue that the Fresno Residence was purchased by them in their individual capacities and not for the Debtor. (See Declaration of Tim McCormick, ¶2.) In addition, the McCormicks will argue that Debtor was solvent at the time of the sale and that the transfer of the sale proceeds was a dividend, not a fraudulent transfer. Trustee has objected to the claim of Cingular and asserted that Cingular owes the Debtor approximately $1,900,000. If Trustee prevails in asserting claims against Cingular, he will not be able to establish that the Debtor was insolvent, and will not be able to establish a fraudulent transfer claim against the McCormicks.

Trustee has no reason to believe that he would have difficulty collecting a judgment against Richard or Shirley McCormick.

## B. The Claim Based on the Sale of the Las Vegas Condominium

As noted above, Renee McCormick sold the Las Vegas Condominium in April 2007 for net proceeds totalling $257,343. (Exhibit J, McCormick Decl., ¶5.) Trustee notes that Debtor paid the down payment for the condominium and paid the mortgage payments on the

condominium (until August 2005). In addition, the Debtor listed the Las Vegas Condominium as an asset on its tax returns. Trustee would argue that although legal title to the condominium was in the name of Renee McCormick, beneficial title to the condominium was in the Debtor. Trustee would also argue that, upon the sale of the condominium, the net sales proceeds of $257,343 belonged to the Debtor and that Renee McCormick is obligated to turnover those proceeds to Trustee.

In defense, Renee McCormick can be expected to argue that the down payment for the condominium was a dividend to her at a time (June 2004) when the Debtor was solvent, and that beneficial title was held by her, not the Debtor. In addition, she will probably argue that the Debtor paid the mortgage payments on the condominium as rent in exchange for the use of the condominium by Debtor's employees (including herself and her husband, Timothy McCormick) when they were in Las Vegas supervising the retail outlets located in Las Vegas. (See McCormick Decl., ¶5.) She will also argue that the mortgage payments after June 2005 were paid by Premiere and Richard and Shirley McCormick, not by the Debtor.

Finally, it appears that Timothy and Renee McCormick have non-exempt assets totalling $50,000 (McCormick Decl., ¶6), and Trustee believes that collection of any judgment would be problematic.

C.    **Other Transfers to the McCormicks**

Trustee might also seek to avoid transfers made by the Debtor or Premiere to the McCormicks on either a preference or fraudulent transfer theory. Debtor's statement of financial affairs discloses no transfers to insiders within the one year prior to the filing of the bankruptcy. This statement appears plausible in light of the fact that the Debtor closed its doors and transferred its business to Premiere Wireless nearly 1 ½ years prior to the filing. Trustee's ability to avoid transfers made between one and two years before the bankruptcy would be determined un Section 548 of the bankruptcy code. As an initial matter, Trustee has not identified any transfers to the McCormicks during this period other than as wages, and has not been able to quantify the amount of wages earned by the McCormicks. However, Trustee might argue that the amount of wages paid to the McCormicks exceeded the reasonable value received by the Debtor,

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

especially if it is determined that some of the McCormicks worked less than fulltime for the Debtor. If Trustee prevailed on fraudulent transfer claims against the McCormicks, he would be able to object to the claims of Tim McCormick under Section 502(d), and might recover some or all of the fraudulent transfers.

The McCormicks will defend such allegations by alleging that the Debtor was solvent at the time of any transfers because the Debtor had a valid claim against Cingular, and because Cingular's claim against the estate is not valid. Thus, if the Trustee prevails in its litigation against Cingular, such a result would probably eliminate Trustee's ability to recover on a fraudulent transfer claim against the McCormicks. Furthermore, the McCormicks will allege that they provided reasonably equivalent value to the Debtor through their employment with the Debtor.

Trustee has no reason to believe that he would have difficulty collecting a judgment against Richard or Shirley McCormick. Trustee believes that, although not under oath, that Timothy and Renee McCormick have non-exempt assets totalling $50,000, and Trustee believes that collection of any judgment from Timothy and Renee McCormick would be problematic.

**D.      Alter Ego/Substantive Consolidation Claims Against McCormicks**

Trustee also could assert "alter ego" claims against the McCormicks and Premiere, as asserted in Cingular's state court action, or the related but different remedy of substantive consolidation. The standard for supporting substantive consolidation was recently described in Simantob v. Lahijani (In re Lahijani), 2005 Bankr. LEXIS 1891 (Bankr. C.D. Cal. 2005). as follows:

> The Ninth Circuit in Bonham decided to follow the test applied by the Second Circuit, namely whether (1) the creditors dealt with the consolidated entities as if they were the same and did not rely on their separate identity in extending credit, or (2) the affairs of the debtor are so entangled that consolidation will benefit all creditors. n60 In either circumstance, "the bankruptcy court must in essence determine that the assets of all the consolidated parties are substantially the same." n61 And although the presence of only one factor is sufficient, "[c]onsolidation under the second factor, entanglement of the debtors affairs, is justified only where the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors' or where no accurate identification and allocation of

WIKI, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

297551.2

- 8 -

assets is possible."

Simantob v. Lahijani (In re Lahijani), 2005 Bankr. LEXIS 1891 (Bankr. C.D. Cal. 2005).

Here, the Trustee can point to the fact that the Fresno Residence and the Las Vegas Condominium were listed on the Debtor's tax returns and, at least as to the Las Vegas Condominium, the mortgage payments were made by the Debtor. However, the standard for showing alter ego or substantive consolidation is high and highly fact intensive, and proof of such theories would be both complex and expensive.

If the Trustee were to prevail on a substantive consolidation or alter ego theory, his recovery would not be cumulative of recoveries based on the other claims against the McCormicks. To the contrary, his recovery would be limited to the amount necessary to satisfy all administrative and prepetition claims. This amount, in turn, would be determined by the outcome of the Cingular litigation. If Trustee prevails in objecting to the Cingular claim and recovers at least $400,000, it is likely that Trustee would receive no recovery at all from the McCormicks on a substantive consolidation/alter ego theory because creditor claims would be satisfied in full from the Cingular recovery. If Trustee does not prevail in his objection to the Cingular claim, Trustee's potential recovery would be the lesser of (1) the total allowed claims in the case (which might total as much as $2.5 million) or (2) the McCormicks' non-exempt assets. Thus, the potential recovery on an alter ego/substantive consolidation theory is highly uncertain.

E.    **Recoveries against Others**

The terms of the proposed settlement also assist the Trustee in potential recoveries from two other possible defendants. First, Trustee has commenced Adversary Proceeding No. 07-2142 against Brian Mekush. Unfortunately, Trustee has had difficulty locating and serving Mr. Mekush. The settlement requires the McCormicks, who are related to Mr. Mekush, to confirm the location of Mr. Mekush and conditions the effectiveness of the settlement on properly serving Mr. Mekush. The McCormicks have already provided the address of Mr. Mekush.

Second, the Debtor has scheduled a possible malpractice claim against the law firm of Lang, Richert & Patch. During the Cingular litigation, Lang, Richert & Patch represented both the Debtors and the McCormicks. In addition, Lang Richert & Patch received payment from both

297551.2

- 9 -

1 Debtor and the McCormicks. To avoid expensive litigation between the estate and the

2 McCormicks over the rights to any malpractice or refund claims against Lang, Richert & Patch,

3 the settlement clarifies that all rights are assigned to Debtor.

4 The provisions of the settlement, therefore, should assist Debtor in obtaining recoveries

5 from third parties.

6 **F.** **Summary of Likely Recoveries**

7 Trustee is currently aware of the foregoing four potential theories for recovery against the

8 McCormicks and Premiere. Trustee believes that a settlement of those legal claims, and all other

9 claims against the McCormicks and Premiere for the sum of $257,343 is fair and equitable under

10 the circumstances.

11 First, Trustee has commenced Adversary Proceeding No. 07-2204 against Cingular

12 seeking (1) disallowance of the claim of Cingular and recovery of $1,970,000 and (2) affirmative

13 recovery against Cingular. If Trustee prevails in this action, the estate will be solvent and the

14 Trustee will not be able to recover any funds from the McCormicks on either a fraudulent

15 transfer, alter ego or substantive consolidation theory.

16 Second, Trustee's maximum possible recovery based upon the sales of the Fresno

17 Residence and the Las Vegas Condominium is the sum of $518,343 ($257,343 plus $261,000.)

18 Additional recoveries based on transfers made to the McCormicks between one and two years

19 prior to the bankruptcy filing are possible, but unquantified. However, this recovery would be

20 reduced by the legal fees required to commence an action, conduct discovery and go to trial.

21 Utilizing an estimate of legal costs in the amount of one-third of the recovery, the net recovery to

22 the estate would be $345,562, or only $88,219 more than the amount offered in the settlement.

23 Trustee believes that the extra $88,219 that might be received by the estate from litigating

24 through trial does not justify the litigation risk associated with the merits of the case or by the risk

25 of Trustee's inability to collect on any judgment obtained against Timothy and Renee

26 McCormick. For these reasons, Trustee believes that the settlement is in the best interest of the

27 estate.

28

2975512

WEIKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

# IV.
# CONCLUSION

This motion is based upon the Declaration of Michael F. Burkart, the Declaration of Tim

McCormick, the Request for Judicial Notice, and the List of Exhibits, all filed in support of this

motion.

WHEREFORE, for the reasons set forth above, Trustee requests the Court to enter an

order pursuant to Federal Rule of Bankruptcy Procedure 9019 approving the settlement

memorialized in Exhibit A.

DATED:        August 7, 2007              WILKE, FLEURY, HOFFELT,
                                          GOULD & BIRNEY, LLP

                                          By:_____
                                                 DANIEL L. EGAN
                                                 Attorneys for Trustee
                                                 MICHAEL F. BURKART

297551.2